**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

TERRY JACOBS, et al.,            Case No. 1:10-cv-536

    Plaintiffs,                       Bertelsman, J.
                                             Bowman, M.J.

   v.

LAMBDA RESEARCH, INC., et al.,

    Defendants.

**MEMORANDUM ORDER**

**I. Introduction**

Plaintiff/Relator Terry Jacobs (hereinafter "Jacobs") initiated this lawsuit under seal, pursuant to the False Claims Act. After the United States filed a Notice of Election to Decline Intervention, U.S. District Judge William O. Bertelsman unsealed the Complaint and directed the record to be opened to the public. (Doc. 8). Shortly thereafter, Defendants moved to dismiss Jacobs's complaint for failure to state a claim and for failure to plead fraud with particularity under Rule 9(b), Fed. R. Civ. P. Judge Bertelsman denied Defendants' joint motion to dismiss, but cautioned Jacobs frankly both during oral argument and in his written order that "should it become apparent that the claims herein are without evidentiary support or are being pursued for an improper purpose, relator is under a duty to dismiss them voluntarily. *See* Fed. R. Civ. P. 11(b)." (See Doc. 24 at 1-2).

The reasons for the presiding judge's comments in this case are clear. Although it is not unusual for a relator in a *qui tam* action to be characterized by a defendant as a

1

disgruntled former employee, few cases involve the type of dynamic that is evident in this case. Briefly, Relator Jacobs has not been employed by Defendants Lambda Research, Inc. ("Lamda") and its subsidiary, Surface Enhancement Technologies Ltd., ("SET"), for more than a decade, since December 2002. In December 2009, following a three-week trial, a Hamilton County Ohio jury found Jacobs jointly and severally liable with his then-employer ("the Ecoroll defendants") for more than $8.3 million dollars based upon participation in a civil conspiracy and misappropriation of trade secrets from Jacobs' former employer, Lamda/SET. In March 2010, the state court awarded Lambda/SET more than $1.4 million dollars in attorney's fees and costs on grounds that the misappropriation was willful and malicious, resulting in a total judgment of nearly $10 million dollars – ultimately against Jacobs alone.[1]

In an earlier published decision concerning a discovery dispute, the First District Ohio Court of Appeals summarized the lawsuit as alleging that Jacobs "made arrangements to leave Lambda and work for Ecoroll, a direct competitor, …illegally contacted Lambda's former customers, disclosed confidential information relating to Lamda's burnishing technology, and interfered with Lamda's business relationships." *Id.*, 869 N.E.2d 39, 41, 170 Ohio App.3d 750, 752 (Ohio Ct. App. 2007). Within two months of the entry of judgment against him, Jacobs filed this federal lawsuit against the same corporate Defendants and Lambda's founder, Paul S. Prevey, III. (Doc. 49-4 at 10, Deposition of Terry Jacobs at 52). Jacobs simultaneously appealed the state court judgment, but the First District Court of Appeals affirmed on February 6, 2013, *see Lambda Research, Inc. v. Jacobs*, 2013 WL 454887 (Ohio Ct. App., Feb. 6, 2013)(per

---

[1] Based upon the entry of a settlement agreement between the Ecoroll defendants and Lamda/SET, the state court subsequently partially vacated the judgment against those defendants.

2

curiam). The Ohio Supreme Court denied further review on June 5, 2013. *Id.*, 988 N.E.2d 579, 136 Ohio St. 3d 1460 (2013)(Table).

Describing Plaintiff's claims in this Court as "retaliatory" and a "slap-suit," Defendants sought both a protective order and to re-seal the entire record. The undersigned denied Defendants' motion to seal the entire case, but did require Jacobs to enter into a protective order. (Doc. 34). On March 21, 2012, the parties filed a Joint 26(f) report that limited discovery to specified contracts in Jacobs's Complaint. (Doc. 36 at 2). On June 24, 2013, the undersigned conducted a telephonic conference due to several disputes concerning the scope of discovery, including whether inspection of Defendant's premises was warranted. Unable to resolve the parties' dispute based upon the parties' informal submissions and oral argument, the Court directed expedited briefing, with the dispositive motion deadline to be reset following the Court's decision. Having completed review of the parties' memoranda and having further considered this issue in light of the record as a whole, the Court now denies Jacobs's request for inspection, as well as Lamda's counter-request for its costs "in defending a frivolous discovery motion." (Doc. 49 at 20).

**II. Analysis**

Under Rule 26(b), Fed. R. Civ. P., this Court construes requests for discovery broadly, in favor of the requesting party. Rarely is a request for relevant discovery denied, absent a strong showing that the request is overly burdensome, unreasonably cumulative, or duplicative. The instant request, however, presents the rare case in which denial is appropriate, because the burden to Defendants far outweighs the benefit of the discovery, considering the needs of the parties and the context of this case as a

whole. *See* Rule 26(b)(1)(C)(iii).

Jacobs's complaint alleges that Defendants violated the False Claims Act by entering into research and production contracts concerning component parts, focusing on the "LCP1 vane" used in a military aircraft engine, subjected to Low Plasticity Burnishing ("LPB") surface treatment. Jacobs alleges that Defendants obtained patents on the LPB process based in part on the representation that the process involved "minimal" plastic deformation, also referred to as "cold working." According to Jacobs, lower cold working "generally provides greater resistance to relaxation of the beneficial compressive residual stress due to thermal and mechanical overload." (Doc. 48-1 at 2). In the simplest layman's terms, the Court interprets this as a representation that a reduction in cold working generally translates to reduced equipment failure.

This is not a patent suit and Jacobs does not *directly* challenge Defendants' patents.[2] However, drawing an analogy between "selling a Cadillac while delivering a Chevy," Jacobs argues that the Defendants defrauded the Government by delivering product that had undergone only "*ordinary* hydrostatic roller burnishing," (Doc. 48-1 at 1, emphasis added), which, while still admittedly improving performance and reducing equipment failure, did not meet the promised specifications concerning the percentage of cold work. Although Defendants have submitted declarations from Navy personnel affirming their satisfaction with the performance of the contracts and generally disavowing Jacobs's assertions of fraud, which one Navy officer calls "false or misleading,"[3] Jacobs contends that the fraud is based on a false claim by Defendants

---

[2]Relator's theory indirectly challenges the patents insofar as he contends that only "ordinary" burnishing is achieved.
[3]Relator conceded in his deposition that the Navy did not share his concern with the percentage of cold working achieved in the LCP1 vane, but argues that the fact that the Government was satisfied with the

4

that the LPB process would result in an LPC1 vane that evidenced "minimal" cold work, – and specifically, cold work below 5%. Jacobs dismisses the evidence filed by Defendants as biased, asserting that the careers of the Government agents who authored the declarations "are affected by the contracts at issue here." (Doc. 50 at 1). Nevertheless, in response to the Defendants' motion to dismiss, Jacobs pointed repeatedly to the allegation that the products delivered to the Government exceeded a 5% "maximum" cold work as evidence of the requisite specificity of his complaint:

> To be clear, Relator alleges in his Complaint: (a) that each of the above contracts called for LPB surface treatment to be performed; (b) that Lambda and SET delivered components under those contracts that were purportedly LPB processed; (c) that Lambda and SET did not actually deliver LPB processed components because the components all had far greater than 5% cold working; (d) that Lambda and SET each invoiced the Government under the contracts, fraudulently claiming that they had complied with the contracts terms (i.e., delivered LPB processed components); (Comp. 25-27.) and (e) as a result of the fraudulent invoicing, which in every case was a pre-condition to payment, the Government made payment to Lambda and SET.

(Doc. 19 at 6, and generally at 6-8, 13, 18-19).

The same 5% promise-versus-delivery issue was the focus of Jacobs's deposition. In fact, at oral argument on the motion to dismiss Jacobs proposed for all discovery to be suspended until such time that "independent" testing on the parts delivered to the Government could be concluded. Counsel stated that if those tests showed that the parts produced by Defendants under the contracts did not exceed 5% "low plasticity" specifications, then Jacobs would dismiss his case. (Doc. 49-1 at 18).

For their part, from the outset of this lawsuit, Defendants have denied any

---

end result (reduced fatigue) does not mean that Defendants did not misrepresent the process used to achieve that result. *See, e.g.*, 49-4 at 14-15, Jacobs Depo. at 192, 203, admitting that the Navy cares only "that the process gives them a fatigue benefit" regardless of whether that benefit is obtained by "low plasticity" burnishing.

5

misrepresentations concerning the 5% issue, arguing that their contracts with the Government simply did not include any specific percentage limitation concerning the amount of cold work for the burnished parts. They represent that LPB improves component performance, and that it has a "tendency to result in lower 'cold work,'" but argue that no particular percentage of cold work was ever promised under the contracts. (Doc. 49 at 4). "The contracts expressly defined LPB without reference to a specific cold work level and did not provide any cold work limit for treated parts." (Doc. 49 at 11). In fact, Defendants note that Lambda produced reports to the Government that clearly showed cold work levels on LPB-treated vanes that exceeded 5%.

Rather than achieving a benefit through any specific "cold work" percentage, Defendants maintain that they delivered the contractual benefit promised, of reduced equipment failure, through their overall LPB process, including the reliability of the control system used in production. Defendants assert that Jacobs attempted to gain unauthorized access to an earlier version (a "Generation 3 unit") of Defendants' system while he was still working for Defendants, but was rebuffed at that time. In the more than a decade since Jacobs' departure, Defendants state that the control system has undergone two significant upgrades relevant to the contracts at issue. For example, whereas the Generation 3 unit in existence at the time of Jacobs's employ was pneumatically powered, the Generation 4 and 5 units are hydraulically powered. (Doc. 49-3 at ¶¶19-21). Thus, aside from the lack of any misrepresentation or promise concerning the 5% issue, Defendants maintain that the control system used in the research and production contracts is not the system that existed at the time Jacobs was still employed, but a different system that remains a highly valued trade secret.

The instant motion concerns Jacobs's request for an on-site inspection of Defendants' current process and control system. Jacobs argues that because Defendants rely upon their process and system as central to the value of the Government contracts, that system has become highly relevant to Plaintiff's claims. Jacobs contends that because no outside testing service has ever confirmed the accuracy of Defendants' current control system,[4] there is insufficient proof that the control system is unique and/or reliable. By contrast, Jacobs asserts that the control system that existed when he was employed by Defendants was neither unique nor reliable. He argues that Defendants have failed to prove that they have altered or modified their system in the past eleven years. Jacobs therefore seeks to inspect and photograph Defendants' equipment used to process the LPC1 vanes for the Government contracts at issue. Jacobs contends that the inspection is relevant insofar as Defendants point to the control system and process to support their defense. Jacobs complained at oral argument, and in the motion filed of record, that the "only photographs produced by Defendants…[concerning the control system]…depict a closed cabinet." (Doc. 48-1 at 7).

Defendants strenuously object to the Rule 34 request. First, Defendants argue that the control process and components to that system are trade secrets that should not be divulged to a known "thief" who has already been convicted of stealing other trade secrets from Defendants. Defendants accuse Plaintiff of seeking to reverse engineer their proprietary LPB system. Defendants have produced more than sufficient evidence for this Court to conclude that their equipment and process are proprietary and

---

[4] Jacobs does not dispute Lamda's representation that it produced in discovery its own quality control data.

7

constitute trade secrets. (*See e.g.*, Doc. 49 at 4-5, Prevey Affidavit). Reiterating their position that the underlying *qui tam* action is meritless, Defendants object that the discovery request to inspect its process is also "objectively meritless, vexatious, and motivated by retaliatory animus." (Doc. 49 at 15).

In response, Jacobs argues that he no longer has a business relationship with the competitor with whom he was found to have conspired in the state case. He argues that he "has not worked in any related industry for years," and that the trade secrets involved in the prior state case "had nothing to do with technology, but rather focused on customer information." (Doc. 48-1 at 9-10). Based on those distinctions, Jacobs urges this Court to ignore the prior state court judgment. In addition, Jacobs argues that the protective order entered by this Court "prevents discovery items designated as confidential from being used or disclosed for any purpose other than this lawsuit." (Doc. 48-1 at 10). As an additional safeguard, Jacobs offers to limit the inspection to counsel "and perhaps a non-party expert." However, during the telephonic hearing, counsel indicated his intention to video-tape the inspection.

Jacobs's arguments are not persuasive. Jacobs himself testified that his former employer terminated him only after Jacobs initiated this *qui tam* action, and that he socializes regularly with the person selected to replace him, who Jacobs himself initially hired and who currently serves as Ecoroll's President. (Doc. 49-1 at 210-211). While the primary focus of the state court suit may have been customer information, Jacobs offers nothing to contradict the Ohio court's prior description of the underlying suit as including the misappropriation of "burnishing technology" information. In short, while the existence of the prior case may not be dispositive, it is not irrelevant to this Court's

8

resolution of the current discovery dispute.

Defendants further argue that Jacobs should not be permitted to "conjure[] up a revised theory of liability only after his original theory was rejected by the Navy and discovery closed." (Doc. 49 at 8-9). Defendants point out that Jacobs did not seek any discovery from the Government, noting again the testimony of Navy personnel that supports Defendants' position that a 5% cold working "maximum" was neither promised by Defendants nor understood by the Government as a material term of the contracts. Having carefully reviewed the complaint, the parties' memoranda concerning the motion to dismiss, the transcript of oral argument before Judge Bertelsman, and the memoranda and exhibits submitted in connection with this discovery dispute, the undersigned agrees that the complaint centers on the theory that Defendants promised but failed to deliver a lower-than-5% cold working threshold under the referenced Government contracts.[5] Until now, Jacobs has never alleged any misrepresentations other than the 5% issue concerning the Defendants' contractual performance. Based upon Jacobs' theory of liability to date, Defendants object on grounds of relevancy. Considering the record as a whole, the undersigned agrees that the request for inspection is only marginally relevant to the Jacobs's claims.

In his reply, Jacobs protests that even if not directly relevant to his original claims, the inspection is necessary and relevant to the defense asserted – that the

---

[5]During the telephonic hearing held prior to briefing, Jacobs insisted that his theory of liability rested on "more than" a theory that Defendants exceeded the promised percentage of cold working. While a portion of Jacobs' memoranda regarding this discovery dispute argues that Defendants also violated the False Claims Act by promising a unique process, but delivering only a conventional burnished product at an inflated price, that much broader theory of "misrepresentation" was not previously considered by the Court in relation to the motion to dismiss under Rule 9(b). Jacobs now argues that a higher percentage of cold working "is beneficial in many applications, and as it turns out the LPC1 vane is one of those applications." (Doc. 50 at 9). However, this premise represents a clear alteration of Jacobs's original theory that Defendants falsely claimed their LPB process resulted in less than 5% cold work.

Defendants' LPB closed-loop control system and process are unique and in accord with the contracts at issue. While more relevant to the defense, this Court cannot agree with Jacobs that the asserted relevance alone justifies granting his request on the facts presented. Defendants have already produced document discovery relating to the reliability of their process, and Jacobs has had access to relevant data regarding the finished products delivered under the contracts. Discovery is now closed but for the requested inspection. Considering the record as a whole, the undersigned concludes that inspection of the control system and individual machine components of the process employed to produce the LPB products would be unduly burdensome in comparison to the benefit to be gained.

Defendants additionally argue that permitting Jacobs to inspect the referenced equipment could "potentially" run afoul of regulations like the International Traffic in Arms Regulations ("ITAR"). Jacobs argues that because Defendants sell the same burnishing process to several civilian customers, ITAR does not apply. Having concluded that Jacobs' request for inspection should be denied on other grounds, the undersigned finds it unnecessary to resolve this issue.

### III. Conclusion and Order

Accordingly, **IT IS ORDERED:**

1. Jacobs's motion to compel inspection of Defendants' facilities (Doc. 48) is DENIED;

2. Lambda's corresponding request for monetary sanctions (Doc. 49) is also DENIED;

3. As discovery concluded on June 21, 2013 but for the dispute resolved herein,

any dispositive motions shall be filed in this case on or before September 3, 2013.

                                             *s/ Stephanie K. Bowman*
                                             Stephanie K. Bowman
                                             United States Magistrate Judge